UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KAYTLYN REINHART, *on behalf of* M.K.R., | CASE NO. 1:25-CV-01073-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Kaytlyn Reinhart, on behalf of minor child M.K.R., challenges the Commissioner of Social Security's decision denying M.K.R. supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated May 27, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Reinhart applied for SSI on M.K.R.'s behalf on February 7, 2023, alleging M.K.R. became disabled as of January 3, 2023 due to oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), learning disability, and behavioral problems. (Tr. 75, 231-32). After the claim was denied on reconsideration, Ms. Reinhart requested a hearing before an administrative law judge. (Tr. 113, 125, 152). On April 29, 2024, M.K.R. and Ms. Reinhart

1

(represented by counsel) appeared before the ALJ. (Tr. 46-74). On September 25, 2020, the ALJ determined M.K.R. was not disabled. (Tr. 94-107). On March 13, 2025, the Appeals Council denied Ms. Reinhart's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.1481). Ms. Reinhart timely filed this action on May 27, 2025. (ECF #1).

## FACTUAL BACKGROUND

**I.      Personal and Vocational Evidence**

M.K.R. was 6 years old on his claimed disability date and 8 years old at the time of the hearing. (*See* Tr. 75, 56). As of the hearing, he was in second grade. (Tr. 57).

**II.      Relevant Treatment and Education Evidence**

M.K.R. had initial evaluations for ADHD in March 2022 and for the autism spectrum in April 2022. (Tr. 430, 405). He was diagnosed "with an explosive disorder, generalized anxiety disorder and ADHD combined type." (Tr. 408). M.K.R. was prone to outbursts of emotion and anger, which were "more likely related to anxiety" and lead his doctor to consider a possible autism diagnosis. (Tr. 405). He was prescribed sertraline for anxiety and Vyvanse.[1] (Tr. 408, 411). Since taking sertraline, M.K.R. appeared happier and less irritable, fearful, or prone to outbursts. (Tr. 385). His prescriptions were held steady in the lead-up to starting first grade. (Tr. 391).

After beginning first grade in September 2022, M.K.R. had some difficulties with hyperactivity and impulsivity, including not sitting still in class, leaving his seat without permission, talking without raising his hand, and leaving the classroom to use the bathroom

---

[1]      Vyvanse is a brand name for lisdexamfetamine, a central-nervous-system stimulant prescribed to control symptoms of ADHD. *See Lisdexamfetamine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a607047.html (last accessed Apr. 14, 2026).

without permission. (Tr. 372). He had no issues with aggression. (*Id.*). His dosage of Vyvanse was increased. (*Id.*).

Around the alleged onset date in January 2023, M.K.R. was hyper and had reduced focus and attention during school and his ADHD was not well-controlled during his doctor's visit so his Vyvanse was again increased. (Tr. 359, 361). By February 2023, his medications were held steady because his behavior had improved and his anxiety was low though he continued to struggle in reading and math. (Tr. 353-57).

In May 2023, M.K.R.'s behavior had improved though he still struggled with reading and math and his mother thought he was still "overly active."[2] (Tr. 451). His teachers did not have recent complaints, though he continued to leave his seat and talk out of turn. (*Id.*). His pediatrician concluded Vyvanse was "not completely effective" because it wore off after about three hours. (Tr. 453). His medication was switched from Vyvanse to methylphenidate (Ritalin).[3] (*Id.*). By the end of May, he was doing well on his new medication. (Tr. 446). By July, he was more impulsive and needed frequent redirection. (Tr. 442) He had moved to a stricter school, so his pediatrician increased his dosage to improve his focus and behavior. (*See* Tr. 443).

By September, M.K.R. was having difficulty adjusting to his new school and he struggled to follow in class, was distracted, and unable to answer when called on. (Tr. 601). He became more nervous and uncomfortable being called out in front of the class and began moving more,

---

[2] The progress note was dated May 9, 2023 though Dr. Eckstein signed the note on June 25, 2023. (*See* Tr. 455). The ALJ refers to the encounter as the "June 2023" visit. (*See* Tr. 99) (citing Tr. 451-56).

[3] Methylphenidate, also known by the brand name Ritalin, is a central-nervous-system stimulant prescribed to control the symptoms of ADHD. *See Methylphenidate*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682188.html (last accessed Apr. 14, 2026).

fidgeting with his hair, and picking at his skin. (*See* Tr. 598, 601). His medication dosage was increased again. (Tr. 601).

In October, M.K.R.'s mother received a complaint from a teacher that he was getting up and running around class in the afternoon. (Tr. 560). On examination, he was active and unable to sit still, impulsive, and needed frequent redirection; his speech and articulation were age appropriate. (Tr. 561). His pediatrician concluded methylphenidate was "completely ineffective" and re-prescribed Vyvanse. (Tr. 562).

By November, M.K.R.'s mother reported to his pediatrician she had "no concerns" and thought his "medication is doing very well for him." (Tr. 537). On examination, his anxiety was improving, his impulsivity had decreased, his need for redirection had improved, and he had age-appropriate speech and articulation. (Tr. 541). He was diagnosed with a mild learning disorder in mathematics. (*Id.*). His medications were unchanged. (*See id.*). That same month, his mother took him to the emergency room for six sutures after he cut his right hand between thumb and index finger while trying to cut cardboard with a box cutter. (*See* Tr. 515-34).

In February 2024, M.K.R.'s mother had no concerns and he had earned A's and B's in school and would "hopefully soon" be on an individualized education plan. (Tr. 474). On examination, he had good hygiene and age-appropriate speech, his activity level and impulsivity were normal, and he needed occasional redirection. (Tr. 478). His mother reported his dosage of Vyvanse was effective in and after school but wore off in the evening. (*Id.*). Since his injury in November, his mother now supervises him more and does not allow tools after his ADHD medications have worn off. (Tr. 478). That month, he underwent standardized testing and scored

4

in the 18th percentile for reading, the 9th percentile for mathematics, and a cognitive skills index of 89. (Tr. 332).

For the 2022-23 school year, M.K.R.'s final first-grade report card commented he made progress in the classroom, though there were still times he was unsure of what to do, he can complete his work and stay on task after redirection. (Tr. 326). There were also times where he would not read a word and instead have someone tell him the word. (*Id.*). He received a D+ in reading, a C in English, a B in mathematics, and met expectations in science and social studies. (Tr. 327).

For the 2023-24 school year, M.K.R.'s third second-grade report card commented he was "making progress" in most areas of reading and mathematics. (Tr. 334). He was reading just below grade level and needed "intensive supports." (*Id.*). Though he began second grade reading below grade level, he was improving and needed a lot of practice. (Tr. 335). In math, he had limited progress in using number sentences but mastery in base-ten numbers. (Tr. 334).

III.    Teacher Questionnaires

In March 2023, M.K.R.'s first-grade teacher, Sean Weisenauer, completed a teacher questionnaire in connection with M.K.R.'s disability application. (Tr. 263-69). Mr. Weisenauer noted M.K.R. had problems in (1) acquiring and using information, (2) attending and completing tasks, and (3) caring for himself but not in (4) interacting and relating with others or (5) moving about and manipulating objects. (Tr. 264-68). The questionnaire did not ask about health and physical well-being.

In the first domain (acquiring and using information), Mr. Weisenauer noted M.K.R. had (1) a serious problem in reading and comprehending written material and expressing ideas in written form; (2) an obvious problem in comprehending oral instructions, understanding school

and content vocabulary, providing organized oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions; and (3) a slight problem comprehending and doing math problems and understanding and participating in class discussions. (Tr. 264).

In the second domain (attending and completing tasks), Mr. Weisenauer noted M.K.R. had (1) a very serious problem completing class/homework assignments; (2) an obvious problem in paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, carrying out multi-step instructions, organizing own things or school materials, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time; (3) a slight problem carrying out single-step instructions and working without distracting self or others; and (4) no problem sustaining attention during play/sports activities, waiting to take turns, and changing from one activity to another without being disruptive. (Tr. 265).

In the fifth domain (caring for himself), Mr. Weisenauer noted M.K.R. had (1) an obvious problem taking care of personal hygiene, caring for physical needs, and knowing when to ask for help; and (2) no problems handling frustration appropriately; being patient when necessary, cooperating in, or being responsible for, taking needed medications; using good judgment regarding personal safety and dangerous circumstances; identifying and appropriately asserting emotional needs; and responding appropriately to changes in own mood. (Tr. 268).

In April 2024, M.K.R.'s second-grade teacher, Ms. Foust, completed a teacher questionnaire in connection with M.K.R.'s disability application. (Tr. 340-47). Ms. Foust noted M.K.R. had no problems across all domains. (Tr. 341-45). Ms. Foust explained M.K.R. was taking

an "ADHD medication" and when "he had come to class without it a couple of times" and "it was very hard for him to calm himself." (Tr. 346). Ms. Foust also explained:

> [M.K.R.] had a very difficult time for about half of the year remembering routines. He constantly asked what station he should go to or the steps of a math problem although [the class] had done these things many times. He always seemed to have a twitch or would pick at his hands daily. All of these things have subsided recently.

*Id.*

## IV.     Prior Administrative Findings

During initial review in April 2023, state agency consultants David Dietz, Ph.D., and Dana Schultz, M.D., opined M.K.R. had a less than marked limitation in five of six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, and (5) caring for himself. (Tr. 78-79). Drs. Dietz and Schultz opined M.K.R. had no limitation in the sixth domain, health and physical well-being. (Tr. 79).

On reconsideration in September 2023, state agency consultants Kristen Haskins, Psy.D., and Uma Gupta, M.D., opined M.K.R. had a marked limitation in caring for himself; less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being; and no limitation in moving about and manipulating objects. (Tr. 87-88).

## V.      Relevant Testimonial Evidence

M.K.R.'s mother reported his medication was increased just two weeks before the hearing. (Tr. 59). He was not currently on an individualized education plan, though his mother was beginning the process to start one for third grade. (Tr. 57). Though at one point, he had been in small groups with a teacher and two other students. (Tr. 58). He had not been held back in school.

7

(Tr. 57). He has trouble in math and reading. (Tr. 57-58). He also struggles with handwriting and spelling. (Tr. 63). He is artistic and every paper that comes home with him from school will have a drawing on the back. (Tr. 65).

During class, he will leave to use the bathroom without asking permission despite being reminded of the rule to ask permission. (Tr. 59). He will pick up his cat wrong despite being told the right way to do so. (Tr 59-60). He will laugh while he does something wrong. (*Id.*). He must be reminded to do chores, and his mother must stay with him and explain step-by-step what to do. (Tr. 61). He will not sit still and focus for his assigned 20-minute reading homework. (*Id.*). He cannot tie his shoes without help and often struggles to dress, brush his teeth, or bathe correctly without direction. (Tr. 58-59, 61).

He struggles to get along with his siblings, including picking fights with his older sister. (Tr. 61-62). He is shyer at school. (Tr. 63). His mother has noticed he behaves better when around people he is not already comfortable with and is calmer and quieter in public. (*Id.*). He struggles to make friends at school and self-isolates during lunch or recess. (Tr. 63-64).

His mother watches him for impulsive actions. When he sees the school bus, she holds him to keep him from running onto the road to wait for the bus. (Tr. 62). One day, he was given safety scissors to cut triangles and decided to use a box cutter. (*Id.*). He cut his hand and needed stitches. (*Id.*). He also has a smartphone for watching videos or playing games and will throw it sometimes. (*Id.*). He gets upset playing video games on his PlayStation and will scream or slam the controller on the ground. (*Id.*). He has broken three televisions. (*Id.*). His parents have tried teaching him to ride a bike, but he will give up in frustration if he does not get it right the first time. (Tr. 64-65).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine whether a claimant is disabled:

1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled regardless of their medical conditions. If not, the analysis proceeds.

2.   Does claimant have a medically determinable, severe impairment, or a combination of impairments, that is severe? For an individual under age 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.   Does the severe impairment meet, medically equally, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor child's functioning is assessed in six functional domains:

1.   Acquiring and using information;

2.   Attending and completing tasks;

3.   Interacting and relating with others;

4.   Moving about and manipulating objects;

5.   Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a). A *marked* limitation seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). It is a more than moderate, but less than extreme, limitation. *Id.* It is the equivalent of the functioning one would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An *extreme* limitation is one very seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). An extreme limitation is more than marked but does not necessarily mean a total lack or loss of ability to function. *Id.* It is the equivalent of functioning one would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id.*

No single piece of information taken in isolation can establish whether a child has a marked or extreme limitation; therefore, test scores are considered together with other available information about the child's functioning. *Id.* § 416.926a(e)(4). Social security adjudicators must assess the interactive and cumulative effects of all the child's impairments and consider the relevant factors affecting a child's functional limitations, including how well the child initiates and sustains activities, how much extra help the child needs, the effects of structured or supportive settings, and how medication or other treatment affects the child. *Id.* § 416.926a(a)(1)-(3).

## THE ALJ'S DECISION

At Step One, the ALJ found M.K.R. had not engaged in substantial gainful activity. (Tr. 95). At Step Two, the ALJ identified "oppositional defiant disorder, intermittent explosive disorder; ADHD; learning disorder; and articulation disorder" as severe impairments. (*Id.*). At Step Three, the ALJ found M.K.R.'s impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 97). The ALJ found M.K.R. had:

- <u>less than a marked</u> limitation in acquiring and using information;
- <u>less than a marked</u> limitation in attending and completing tasks;
- <u>less than a marked</u> limitation in interacting and relating with others;
- <u>no</u> limitation in moving about and manipulating objects;
- <u>less than a marked</u> limitation in the ability to care for himself; and
- <u>less than a marked</u> limitation in health and physical well-being.

(Tr. 98). Thus, the ALJ concluded M.K.R. was not disabled. (Tr. 106).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence

11

evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d

12

875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Reinhart argues the ALJ's decision lacks substantial evidence because the ALJ did not consider the longitudinal record when evaluating M.K.R.'s functioning in three of the childhood domains: caring for oneself, acquiring and using information, and attending and completing tasks. (ECF #9 at PageID 761, 769, 771). Within the argument for the first domain, Ms. Reinhart also argues the ALJ mis-evaluated the prior administrative findings. (*Id.* at PageID 762-65). The Commissioner responds the ALJ's findings in those three domains are supported by substantial evidence, the ALJ was not obligated to discuss every single piece of evidence in the record, the ALJ discussed the evidence elsewhere in the decision, and the ALJ properly analyzed the prior administrative findings. (ECF #11 at PageID 795-96). Ms. Reinhart replies that the Commissioner's arguments are improper post-hoc rationalizations and contends the ALJ did not discuss the evidence elsewhere in the decision. (ECF #12 at PageID 807, 812).

## I.     Caring for oneself

Ms. Reinhart blends several arguments for how the ALJ erred in finding M.K.R. has a less than marked limitation in the domain of caring for himself. (*See* ECF #9 at PageID 762). First, she argues the ALJ did not properly analyze the prior administrative findings. (*Id.* at PageID 762-65). Second, she argues Dr. Haskins's findings on reconsideration review were supported by and consistent with the overall evidence. (*Id.* at PageID 766-68). Third, she argues the ALJ did not analyze the entire record and omitted evidence supporting greater limitations, including evidence

13

of rocking, that M.K.R. did not develop an understanding of acceptable and unacceptable behavior, and that he did not begin to demonstrate consistent control over his behavior. (*Id.* at PageID 768-69; *see also* ECF #12 at PageID 808-09).

With respect to the prior administrative findings, Ms. Reinhart asserts the ALJ provided a conclusory analysis of the initial review findings. (ECF #9 at PageID 762-65). She then argues the ALJ did not evaluate the consistency of the reconsideration findings because (1) the evidence the ALJ cited as supporting a limitation in attending to tasks or interacting with others and not caring for yourself does pertain to the domain of caring for himself, (2) the ALJ did not discuss a body of consistent evidence while analyzing the consistency factor, and (3) other evidence in the record supported the opinion. (ECF #9 at PageID 764-68; ECF #12 at PageID 810).

In determining childhood disability, the ALJ will "consider all evidence in [the] case record," including the medical opinions. 20 C.F.R. § 416.924a(a), (a)(1)(i). The ALJ must review all medical opinions and explain how persuasive he finds them. *See id.* § 416.920c(b). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that support or contradict a medical opinion. *Id.* § 416.920c(c)(1)-(5). The regulations require the ALJ "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," the two principal factors. *See id.* § 416.920c(b)(2). An ALJ need not specifically use the terms "supportability" or "consistency" so long as the analysis substantively engages with those factors. *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022).

Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017). If the ALJ discusses both consistency and supportability and substantial evidence supports that discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Turning to her first argument concerning the prior administrative medical findings Ms. Reinhart contends the ALJ performed only a conclusory analysis of the initial opinions of Drs. Dietz and Schultz because the ALJ did not explain how the supportability and consistency factors were applied. (ECF #9 at PageID 763). The ALJ analyzed the prior administrative findings as follows:

> In determining the degree of limitation in the claimant's functioning, the undersigned has also considered the medical opinions in accordance with the applicable regulations. Turning to evaluation of this evidence, when the claimant's medical evidence was initially reviewed by state agency medical consultants, it was opined the claimant had less than marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks; less than marked limitations in interacting and relating with others; less than marked limitations moving about and manipulating objects; less than marked limitations in caring for yourself; and no limitation in health and physical well-being. This opinion is mostly persuasive as it is mostly consistent with and supported by the medical evidence of record. However, the record also supports that the claimant had less than marked limitations in health and physical well-being due to being prescribed daily medications for his severe impairments.

(Tr. 100) (citation omitted).

Ms. Reinhart argues the ALJ's analysis was insufficient because it was a single conclusory phrase that the "opinion is mostly persuasive as it is mostly consistent with and supported by the

medical evidence of record." (ECF #9 at PageID 763). But the ALJ wrote more than that. In the following sentence, the ALJ found "the record also supports that the claimant had less than marked limitations in health and physical well-being due to being prescribed daily medications for his severe impairments." (Tr. 100). This evidence directly goes to the domain of health and physical well-being. That domain "addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being." *See* Social Security Ruling (SSR) 09-7p, 2009 WL 396030, at *2 (Feb. 17, 2009). Thus, M.K.R.'s ADHD, a condition requiring daily prescription medication with side-effects, is inconsistent with the prior administrative findings of no limitation in this domain and supports at least some limitation. *See Guthrie v. Comm'r of Soc. Sec.*, No. 3:22-cv-1309, 2023 WL 6258259, at *3 (N.D. Ohio Sept. 26, 2023) (discussing cases where interrogating the evidence the consultant relied on can implicate both the supportability and consistency factors). Though the ALJ's analysis was brief, it was not mere boilerplate and interrogating the cited medical evidence implicated the supportability and consistency factors.

Next, Ms. Reinhart argues the ALJ's improperly rejected Dr. Haskins's findings on reconsideration because (1) the evidence the ALJ cited as supporting a limitation in attending to tasks or interacting with others and not caring for yourself does pertain to the domain of caring for himself, (2) the ALJ did not discuss a body of consistent evidence while analyzing the consistency factor, and (3) other evidence in the record supported the opinion. (ECF #9 at PageID 764-68; ECF #12 at PageID 810).

The ALJ analyzed the findings on reconsideration as follows:

Upon reconsideration, it was opined the claimant had less than marked limitations in acquiring and using information; less than marked limitations in attending and

completing tasks; less than marked limitations in interacting and relating with others; no limitations moving about and manipulating objects; marked limitations in caring for yourself; and less than marked limitations in health and physical well-being. This opinion is not totally persuasive as it is not totally consistent with or supported by the medical evidence of record. The record does not support marked limitations in caring for yourself as the evidence used to support this does not fit into this category. The state consultant supports marked limitations by saying a July 2023 examination showed variable eye contact, increased impulsivity, medication increased, and he required frequent redirection and correcting throughout the entire visit. They also noted in May 2023 that the claimant did not play quietly and teachers said he was getting out of this seat. This evidence goes towards the attending or interacting domains and does not support a limitation in caring for yourself and this does not support that the claimant required parent/caretaker intervention or was harming himself. In February 2024 it was noted the claimant had A's and B's at school and did not have an IEP. Examination showed he had good hygiene; was smiling and alert; was well-appearing and in no acute distress; had no focal deficits; was not clumsy; receptive speech was appropriate for age; he maintained eye contact and speech was age appropriate; activity level was normal; impulsivity was normal; he required occasional redirection; and expectations were appropriate with developmental and current functioning. The claimant's mother stated that Vyvanse 40mg was effective in and after school but wore off in the evening.

(Tr. 100) (citations omitted).

Ms. Reinhart argues the ALJ erred in finding the evidence the state agency consultant cited "goes towards the attending or interacting domains and does not support a limitation in caring for yourself" when the evidence supports limitations in multiple domains. (ECF #9 at PageID 764-65). The same impairments can cause limitations over multiple domains. *See Stone v. Comm'r of Soc. Sec.*, No. 1:21-cv-1446, 2022 WL 7045596, at *7-8 (N.D. Ohio Oct. 12, 2022) (cting SSR 09-7p, 2009 WL 396029, at *4). The ALJ recognized this by finding the evidence supports both "the attending *or* interacting domains." (Tr. 100) (emphasis added). Rather, the ALJ concluded the evidence does not go to the domain of caring for himself. Ms. Reinhart does not argue this finding is wrong, but challenges "the marked limitations assessed by Dr. Haskins could reasonabl[y] cause limitations in carrying for self in addition to the domains identified by the ALJ." (ECF #9 at PageID 765). But the ALJ found M.K.R. had less than marked limitation in caring for himself later in the decision

17

and cited a February 2024 examination showing good appetite, sleep, and hygiene and an April 2024 Teacher Questionnaire that noted no problems in that area. (Tr. 105) (citing Tr. 474 and 345). Deciding evidence could reasonably cause marked or less than marked limitations in a domain requires weighing the evidence, yet the role of the court is not to re-weigh evidence but decide whether substantial evidence supports the ALJ. *See Williams-Dorsey v. Comm'r of Soc. Sec.*, No. 1:23-cv-2331, 2024 WL 3455035, at *6-7 (N.D. Ohio July 18, 2024). Thus, this argument does not support remand.

Next, Ms. Reinhart argues the ALJ did not discuss a body of consistent evidence while analyzing the consistency factor. (ECF #9 at PageID 765-66). She points to treatment notes from April and June 2022 and January, February, May, July, September, October, and November 2023. (*Id.* at PageID 766-68). Although the substantial evidence standard is largely deferential, the Sixth Circuit has emphasized the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007). The *Rogers* court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history." *Id.* Even though the standard does not set a high bar, it does require discussion of the significant probative evidence. *See Stone*, 2022 WL 7045596, at *9.

At the same time, an ALJ does not have to discuss each piece of data in the opinion, so long as the ALJ "consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F.App'x 195, 199 (6th Cir. 2010). Ms. Reinhart does concede "the ALJ partially summarized treatment notes from February 2023, June 2023, July 2023, September 2023,

November 2023, and February 2024." (ECF #9 at PageID 768). The ALJ also cited an April 2024 Teacher Questionnaire that noted no problems in that area. (Tr. 105) (citing Tr. 345). That evidence covers a similar time period (February 2023 thru April 2024) than the evidence Ms. Reinhart cited (April 2022 thru November 2023).

Ms. Reinhart points to the fact the ALJ discussed just one mental-status examination, February 2024. (ECF #9 at PageID 768). Even so, discussing only the most recent mental-status examination alongside other evidence from the alleged onset date through February 2024 is not a strong sign that ALJ failed to review the record as a whole.

Ms. Reinhart also points to two treatment notes showing rocking, a mannerism that under 20 C.F.R. § 416.926a(k)(3)(ii) is consistent with limited functioning in this domain. (ECF #9 at PageID 768 (citing Tr. 405, 582); *see also* Tr. 105 (citing 20 C.F.R. § 416.926a(k)(3)). In April 2022, M.K.R.'s mother reported "[h]e frequently exhibited rocking." (Tr. 405). While the page Ms. Reinhart cited for September 2023 does not mention rocking (*see* Tr. 582), elsewhere in the note M.K.R.'s pediatrician noted "he has repetitive movements such as rocking [t]hat [he] does when anxious" (Tr. 584, 586). A review of the record shows M.K.R. also exhibited rocking in March 2022 (Tr. 434, 435). There are no further reports of rocking after September 2023.

While the ALJ did not mention this evidence of rocking, a review of the record shows the ALJ considered the evidence. Again, the ALJ need not discuss every piece of evidence so long as the ALJ considers the evidence as a whole. *Boseley*, 397 F.App'x at 199. "Further, an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Daniels v. Comm'r of Soc. Sec.*, 152 F.App'x 485, 489 (6th Cir. 2005) (quotation omitted). Here, one treatment note observed M.K.R. "has repetitive movements such as rocking [t]hat [he] does when anxious." (Tr. 584, 586).

19

The ALJ considered M.K.R.'s anxiety, noting previously his "anxiety scores suggested good control." (Tr. 99). Additionally, the ALJ considered the initial administrative findings from April 2023, finding them mostly persuasive. (Tr. 100). The state agency reviewer considered evidence of M.K.R.'s rocking, listing in the evidence considered: "Mom had previous concerns about child being on spectrum—demonstrates rocking behavior . . . Demeanor overall consistent with child on spectrum." (Tr. 77). While M.K.R.'s pediatrician considered a possible autism diagnosis (*see, e.g.*, 435, 405, 435) and an autism screening (Tr. 584), the record does not contain a diagnosis. The reviewer opined M.K.R. had a less than marked limitation in caring for himself. (Tr. 79). Although Ms. Reinhart contends the ALJ did not properly explain the analysis of the initial administrative findings (*see* ECF #9 at PageID 763; ECF #12 at PageID 809-10), the ALJ did consider their findings in each domain. Thus, between the ALJ's consideration of M.K.R.'s anxiety, the cause of his rocking, and the initial administrative findings that considered reports of rocking, it is apparent the ALJ considered the record on as a whole.

Ms. Reinhart also argues the longitudinal record supports and is consistent with the opinion on reconsideration that M.K.R. had a marked limitation in this domain. (ECF #9 at PageID 766-68). By analyzing the opinion's explanation and cited evidence and contrasting the opinion with a later examination and Ms. Reinhart's testimony (Tr. 100), the ALJ satisfied the articulation requirements of 20 C.F.R. § 416.920c. Although Ms. Reinhart cites other record evidence that, in her view, supports and is consistent with the opinion, the court cannot reweigh the evidence when substantial evidence supports the ALJ's decision. *Paradinovich*, 2021 WL 5994043, at *7.

I thus decline to recommend remand on these bases.

**II.**        **Acquiring and using information**

Ms. Reinhart argues the ALJ did not build an accurate and logical bridge from the evidence to the finding that M.K.R. has a less than marked limitation in acquiring and using information because the ALJ did not discuss education records showing he read below grade level, had poor grades in first grade, poor scores in standardized testing, and difficulty in the first half of second grade. (ECF #9 at PageID 769-70). The Commissioner responds the ALJ is not required to cite every piece of evidence in the record, the ALJ cited M.K.R. most recently earned A's and B's, the omitted education records do not by themselves establish a marked limitation in this domain, and the prior administrative findings all found a less than marked limitation. (ECF #11 at PageID 801-02). After reviewing the decision as a whole, I conclude the ALJ did consider M.K.R.'s education records as a whole and did articulate an adequate explanation that he faced a less than marked limitation because his functioning in this domain had improved with time.

A challenge that the ALJ mischaracterized or "cherry-picked" the record to discuss only information detrimental to the claimant "is seldom successful because crediting it would require a court to reweigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). The process of choosing which evidence to cite "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

The ALJ analyzed the domain of acquiring and using information as follows:

The claimant has less than marked limitation in acquiring and using information. A March 2023 Teacher Questionnaire noted the claimant had a serious problem in reading and comprehending written material and in expressing ideas in written form. He also had an obvious problem comprehending oral instructions; understanding school and content vocabulary; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. Communication skills were typical of his peers. In February 2024 it was noted the claimant had A's and B's at school and did not have an IEP. Examination showed he had good

21

hygiene; was smiling and alert; was well-appearing and in no acute distress; had no focal deficits; was not clumsy; receptive speech was appropriate for age; he maintained eye contact and speech was age appropriate; activity level was normal; impulsivity was normal; he required occasional redirection; and expectations were appropriate with developmental and current functioning. The claimant's mother stated that Vyvanse 40mg was effective in and after school but wore off in the evening. An April 2024 Teacher Questionnaire noted the claimant was in the actual second grade level but was below grade level in reading and was on level with math and written language. The claimant had no limitations in this area. Therefore, the undersigned finds the claimant has less than marked limitations in this domain.

(Tr. 101-02) (citations omitted).

Although the ALJ's analysis of this domain excludes a great deal of record evidence, a reviewing court must also look to what evidence the ALJ discusses elsewhere in the decision to see whether the ALJ considered the evidence that did not make it into this portion of the written decision. *Claudio o/b/o E.P.I.C. v. Comm'r of Soc. Sec.*, No. 3:21-cv-1661, 2022 WL 4395399, at *2 (N.D. Ohio Sept. 23, 2022). Ms. Reinhart contends the ALJ did not discuss M.K.R.'s final report card for first grade (2022-23 school year), academic testing in February 2023, or his report card for the first half of second grade (2023-24 school year) in this domain or the main statement of facts. (*See* Tr. 98-102; *see also* Tr. 326-37, 332, 334-35). Ms. Reinhart is correct the ALJ did not mention M.K.R.'s standardized testing, but the ALJ did address both his grades in first and second grades.

The ALJ did mention M.K.R.'s first-grade report card while analyzing his ability to attend and complete tasks, finding "[a] school report at the end of his 1st grade year noted the claimant had made progress in the classroom and although there were times where he was not sure what he was to do, after redirection he was able to complete his work and stay on task." (*See* Tr. 103). The ALJ also cited the report card in analyzing the domain of interacting and relating with others. (*See* Tr. 104). True, the ALJ could have similarly cited the report card when discussing the domain

22

of acquiring and using information. But these citations in other domains show the ALJ nevertheless considered M.K.R.'s first-grade report card.

The ALJ did not similarly cite M.K.R.'s second-grade report card. But the ALJ twice discussed other evidence about M.K.R.'s grades in second grade. Earlier in the decision, the ALJ found "[i]n November 2023, the claimant's mother reported no concerns and said she felt medication was doing very well for him. No changes in medications were requested, there were no concerns with current grades in school." (Tr. 99) (citing Tr. 537). That November 10, 2023 note reports "no concerns" for M.K.R.'s grades when he was in the first half of second grade. (Tr. 537). The ALJ also found: "In February 2024, it was noted [M.K.R.] had A's and B's at school and did not have an IEP." (Tr. 99) (citing Tr. 474). Similarly, the ALJ considered a questionnaire M.K.R.'s second-grade teacher completed that noted he has no observed problems in acquiring and using information. (*See* Tr. 102) (citing Tr. 341). Thus, the ALJ did not overlook M.K.R.'s grades in second grade, even though the ALJ did not directly cite his report card. Ms. Reinhart contends not citing the report card was cherry-picking because it showed M.K.R. faced "greater difficulties in the first half of the school year." (ECF #9 at PageID 770). True, his grades were lower in the first half of second grade, but his grades improved in the third quarter. (*See* Tr. 334-35). But for the court to credit M.K.R.'s earlier grades over his later grades, the treatment notes' descriptions, or teacher questionnaires "would require a court to reweigh record evidence," which it cannot do. *DeLong*, 748 F.3d at 726.

Ms. Reinhart correctly points out the ALJ did not discuss 2023 standardized testing. (ECF #9 at PageID 770; *see also* Tr. 332). But she does not explain in either her main or reply briefs how this omission suggested the ALJ did not review the record as a whole. While the court

23

could reject this as waived, *see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997), omitting M.K.R.'s test scores does not show the ALJ erred here. Social Security regulations provide the agency "will not rely on any test score alone" when assessing childhood disability. 20 C.F.R. § 416.926a(e)(4)(i). Instead, the Commissioner also "will consider [a claimant's] test scores together with the other information . . . including reports of classroom performance and the observations of school personnel and others." *Id.* § 416.926a(e)(4)(ii). M.K.R.'s standardized testing was split. He scored in the 18th percentile in reading and the 9th percentile in math (Tr. 332), which would put him at or past the threshold for a marked limitation at two standard deviations below the mean. *See* 20 C.F.R. § 416.926a(e)(2)(iii). But M.K.R. received a "cognitive skills index of 89," which was explained to be "similar to an IQ score, where 85-115 is considered average" (Tr. 332); as such, this was not evidence that his performance was two standard deviations below the mean. That the standardized tests could support a marked or less than marked limitation does not suggest the ALJ cherry-picked evidence by omitting them. Instead, the mixed results support the ALJ's choice to rely on M.K.R.'s grades and the teacher questionnaires. *See* 20 C.F.R. § 416.926a(e)(4)(ii) (other information about a claimant's functioning include "reports of classroom performance and the observations of school personnel").

Last, Ms. Reinhart argues "the ALJ's summation of the three pieces of evidence does not explain how the evidence results in less than a marked limitation." (ECF #9 at PageID 770). In assessing the sufficiency of the ALJ's explanation, it "need not be so comprehensive as to account with meticulous specificity for each finding and limitation" but "the ALJ must explain [the] conclusions enough for a reviewing court to trace the path of her reasoning." *See Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 WL 9064960, at *10, (N.D. Ohio Dec. 14, 2023) (cleaned up),

24

*report and recommendation adopted*, 2024 WL 37877 (N.D. Ohio Jan. 3, 2024). Here, although the ALJ did not spell out every logical step, the court can readily trace the path of the ALJ's reasoning: M.K.R. gradually improved over 2023 to 2024. The ALJ began with a 2023 questionnaire showing serious or obvious problems in many areas related to acquiring and using information. (*See* Tr. 101) (citing Tr. 264). Then the ALJ noted that by February 2024, M.K.R. "had A's and B's at school" and a mental-status examination that month showed age-appropriate speech, a consideration for this domain. (Tr. 101-02) (citing Tr. 474, 478). The ALJ then noted "Vyvanse 40mg was effective in and after school," again citing the February 2024 examination. (*See* Tr. 102) (citing Tr. 478). The ALJ then finally noted M.K.R.'s second-grade teacher noted "no limitations" in this domain. (Tr. 102) (citing Tr. 341). This evidence, presented in chronological order, reveals the ALJ's unstated theory that M.K.R. gradually improved in this domain over time. He started off worse in 2023, but—as his medication was calibrated—he had better grades by 2024 and he was observed less limited by his teacher.

I thus decline to recommend remand on these bases.

### III.    Attending and completing tasks

Ms. Reinhart argues the ALJ did not build an accurate and logical bridge from the evidence to the finding that M.K.R. has a less than marked limitation in attending and completing tasks because the ALJ did not discuss treatment records showing M.K.R. was often distracted, could not remain focused, needed prompting and redirection, and was impulsive, each associated with greater limitations. (*See* ECF #9 at PageID 773-74; ECF #12 at PageID 812). The Commissioner responds that substantial evidence supports the ALJ's findings and the mere existence of contrary evidence in the record does not justify remand. (ECF #11 at PageID 803-04).

It bears repeating that the ALJ need not discuss every piece of evidence so long as the ALJ considers the evidence as a whole and reaches a reasoned conclusion. *Boseley*, 397 F.App'x at 199. And a reviewing court looks to the ALJ's discussion elsewhere in the decision to see what evidence the ALJ considered. *Claudio*, 2022 WL 4395399, at *2. Additionally, the fact an ALJ does not cite specific evidence on its own "does not indicate that it was not considered." *Daniels*, 152 F.App'x at 489.

The ALJ analyzed this domain as follows:

The claimant has less than marked limitation in attending and completing tasks. A March 2023 Teacher Questionnaire noted the claimant had a very serious problem completing class/homework assignments and an obvious problem paying attention when spoken to directly; focusing long enough to finish assigned activity or task; refocusing to task when necessary; carrying out multi-step instructions; organizing own things or school materials; completing work accurately without careless mistakes; and working at a reasonable pace/finishing on time. A school report at the end of his 1st grade year noted the claimant had made progress in the classroom and although there were times where he was not sure what he was to do, after redirection he was able to complete his work and stay on task. In February 2024 it was noted the claimant had A's and B's at school and did not have an IEP. Examination showed he had good hygiene; was smiling and alert; was well-appearing and in no acute distress; had no focal deficits; was not clumsy; receptive speech was appropriate for age; he maintained eye contact and speech was age appropriate; activity level was normal; impulsivity was normal; he required occasional redirection; and expectations were appropriate with developmental and current functioning. The claimant's mother stated that Vyvanse 40mg was effective in and after school but wore off in the evening. An April 2024 Teacher Questionnaire noted the claimant was in the actual second grade level but was below grade level in reading and was on level with math and written language. The claimant had no limitations in this area. It was further noted the claimant had a very difficult time for about half of the year with remembering routines, but this had subsided. Therefore, the undersigned finds the claimant has less than marked limitations in this domain.

(Tr. 102-03) (citations omitted).

Ms. Reinhart contends the ALJ did not discuss M.K.R.'s treatment records from January, February, May, July, September, and October 2023 and February 2024 showing M.K.R. was distracted, needed redirection, struggled to focus, and interrupted others. (ECF #9 at PageID

26

773-74). To start, the February, July, and September 2023 and February 2024 notes Ms. Reinhart offered as examples of evidence the ALJ selectively omitted do, in fact, appear in the decision. The ALJ quoted the assessment from M.K.R.'s pediatrician in February 2023, though not mentioning redirection, activity, or impulsivity. (Tr. 99) (citing Tr. 353-55). Then, the ALJ discussed the July 2023 note, briefly saying: "In July 2023, the dosage of Adderall was increased." (Tr. 99) (citing Tr. 444). Next, the ALJ more fulsomely discussed the September 2023 note, finding "[i]n September 2023 it was reported the claimant was not doing his work when asked to do his independent work at his desk and would just sit and fidget with his hair. He had changed schools and was having difficulty with attention. Medications were adjusted." (Tr. 99) (citing Tr. 598-601). Last, the ALJ discussed the February 2024 note, finding "[e]xamination showed . . . he required occasional redirection . . . ." (Tr. 99) (citing Tr. 478). Here, the ALJ made the exact finding that Ms. Reinhart argues the ALJ ignored—that M.K.R. needed occasional redirection. (*Compare* ECF #9 at PageID 774) (citing Tr. 478)). The ALJ also repeated this finding in the domain analysis. (Tr. 103) (citing Tr. 478). The ALJ cannot have overlooked a finding that the ALJ made twice.

For the other three treatment notes, Ms. Reinhart can show the ALJ did not repeat each and every finding when writing the decision. But that by itself does not mean the ALJ did not consider those findings when the ALJ discussed those treatment notes. Paring down is a necessary part of summarization. And the ALJ's quotations and descriptions are accurate. Though the ALJ did not comment on specific findings of increased impulsivity and distractibility, the ALJ did comment on M.K.R.'s fidgeting and difficulty completing his schoolwork independently in September 2023. (Tr. 99) (citing Tr. 598-601). The ALJ primarily focused on M.K.R.'s medication calibration over time, a rough proxy for his symptoms overall. That the ALJ chose to focus on

27

medication rather than track the specific ratings on each of M.K.R.'s mental-status examinations is not a strong sign the ALJ selectively read the record.

Ms. Reinhart's cherry-picking argument also does not reckon that the ALJ did not mention other positives that would be expected had the ALJ been overly selective. The ALJ did not mention M.K.R.'s behavior had improved and his anxiety (a cause of behavioral issues) was low in February 2023 (Tr. 353-57), his anxiety was decreased in July 2023 (Tr. 442), he could follow age-based instructions without the need to repeat in July and September 2023 (Tr. 442, 601), and his mother had no concerns in February 2024 and his activity level and impulsivity were normal (Tr. 478). A cherry-picking argument "cuts both ways." *White*, 572 F.3d at 285. True, the ALJ did not mention some indicators of worse symptoms, but the ALJ also did not mention some indicators of better symptoms. This does not show an overly selective review of the record, but "can be described more neutrally as weighing the evidence." *Id.* at 284. Thus, the ALJ's omission of these records does not show the ALJ selectively read the record.

This leaves the notes from January, May, and October 2023 not directly mentioned in the ALJ's decision. The January note showed M.K.R. was hyper, impulsive, had reduced focus and attention, and needed redirection (*See* Tr. 359-61). The May note showed he needed frequent redirection, was more active and impulsive, did not follow instructions, and needed to be told multiple times to start tasks. (Tr. 447). The October note showed M.K.R. was excitable, impulsive, inattentive, distractible, fidgeting, and restless. (Tr. 561, 568). Again, the ALJ need not discuss every piece of evidence so long as the ALJ considers the evidence as a whole. *Boseley*, 397 F.App'x at 199. And that an ALJ does not cite specific evidence on its own "does not indicate that it was not considered." *Daniels*, 152 F.App'x at 489. The ALJ considered M.K.R. was hyperactive,

28

distractable, had reduced focus, and needed redirection by finding he was "overly active" and would often get out of his seat in class in June 2023 and did not do his schoolwork and struggled with attention in September 2023. (Tr. 99) (citing Tr. 353-55, Tr. 598-601). That the ALJ chose to credit later evidence showing M.K.R.'s gradual improvement as his medication was calibrated does not mean the ALJ did not consider M.K.R.'s baseline condition in 2023.

Ms. Reinhart also points out the notes also showed M.K.R. had a Conners Score[4] of 10-3-13 in May and 10-0-10 in October (Tr. 556, 560) and a Werry-Weiss-Peters Activity Rating score[5] of 23-25. (Tr. 570). These objective ratings are helpful in assessing a child with ADHD. But "test scores are considered together with other available information" and "[n]o single piece of information taken in isolation" can prove a marked limitation. 20 C.F.R. § 416.926a(e)(4). Ms. Reinhart does not argue these scores indicate something not found elsewhere in the record. The record already well-establishes M.K.R.'s hyperactivity, which these tests would measure. (*See, e.g.,* Tr. 359-61, 447, 561, 568). These scores also impound information from teachers, which the Teacher Questionnaires included. (*See* Tr. 264-68, 340-47). Thus, while the ALJ did not mention these test scores, that omission does not show error.

I thus decline to recommend remand on these bases.

---

[4]    The Conners Rating Scale collects answers from parents and teachers to create a comprehensive inventory of a child's behaviors. The Conners test helps measure hyperactivity, provide a perspective on a child's behavior from those who interact closely with the child on a regular basis, and establish a baseline before beginning therapy and medications. *See Dodson v. Colvin*, No. 3:15-cv-497, 2016 WL 541471, at *1 n.1 (N.D. Ohio Feb. 11, 2016).

[5]    The Werry-Weiss-Peters Activity Scale is a commonly used parent rating scale that, unlike the Conners scale, solely rates a child's hyperactivity. It "consists of 22 items each relating to the child's activity in a specific situation such as at meals or watching television." *See, e.g.,* U.S. FOOD & DRUG ADMIN, GUIDELINES FOR THE CLINICAL EVALUATION OF PSYCHOACTIVE DRUGS IN INFANTS AND CHILDREN, Food Drug Cosm. L. Rep. ¶ 310,076 (Feb. 1, 1997).

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: April 14, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

30